IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| HOME INSTEAD, INC., a Nebraska Corporation,<br><br>                    Plaintiff,<br><br>vs.<br><br>DAVID FLORANCE, MICHELLE FLORANCE, and FRIEND OF A FRIEND, INC.,<br><br>                    Defendants. | 8:12CV264<br><br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the motion for preliminary injunction (filing 9) filed by defendants David and Michelle Florance and Friend of a Friend, Inc. (collectively, "the Florances"). The Court has considered the parties' briefs (filings 15, 19, and 23) and indexes of evidence (filings 10, 12, and 20), as well as the argument and evidence presented at a hearing on the Florances' motion. *See* filing 21 (text entry); filing 22. The Court overrules the parties' evidentiary objections made at the September 18, 2012, hearing, and for the reasons discussed below, denies the Florances' motion for preliminary injunction.

## I. BACKGROUND

Home Instead provides non-medical companionship and domestic care services for senior citizens, through its many independently owned and operated franchises. Filing 20-1 at ¶¶ 6–7. David and Michelle Florance are a husband and wife team that own and manage Friend of a Friend, Inc., a Florida corporation that operates two Home Instead franchises in different parts of Florida. Filing 10 at ¶¶ 3, 5–7.

In 1997, Home Instead and Friend of a Friend executed franchise agreement no. 176 (the "Initial Agreement"), granting Friend of a Friend the exclusive right to own and operate a Home Instead franchise in a specific area of Florida. Filing 20-1 at ¶ 21; filing 20-9. The Initial Agreement for no. 176 was to last 5 years and was set to expire on August 4, 2002. Filing 20-1 at ¶¶ 21, 29. In 1999, Friend of a Friend entered into a second franchise (no. 285) for a different area of Florida. Filing 20-1 at ¶¶ 23, 27; filing 20-11. This

agreement was also set to expire on August 4, 2002. Filing 20-1 at ¶¶ 25, 29. The terms of both agreements were identical in all relevant respects. Filing 20-1 at ¶ 25; filing 20-10; filing 20-9; filing 20-11.

    Friend of a Friend and Home Instead renewed both franchises in 2002 for a period of 10 years, each to expire (unless renewed again) on August 3, 2012. Filing 20-1 at ¶¶ 29–43. Both franchises were renewed by execution of a new "Renewal Agreement" for each, which set forth the terms of the franchise for the next 10 years. *See* filings 20-14 and 20-15. Each Renewal Agreement was based on the then-current standard franchise agreement used by Home Instead. Filing 20-1 at ¶¶ 41–42; filing 20-16. Home Instead's practice was (and is) to use the same form agreement for new and renewal franchises, and to simply cross out portions that do not apply to renewals. Filing 20-1 at ¶ 32.

    Two provisions of the Renewal Agreements are key to this dispute. The first, set forth in sections 15.A and 15.C of both Renewal Agreements, governs the franchisee's right to renew the agreement:

    **15.    RENEWAL OF FRANCHISE**
        **A.    FRANCHISEE'S RIGHT TO RENEW**

    If, upon expiration of the initial term of the Franchise, Franchisee has during the term of this Agreement substantially complied with all its material provisions and **agrees to comply with the specifications and standards then applicable for new franchised businesses,** then Franchisee has a right to renew the franchise for an additional term equal to the then-customary initial term granted under Franchisor's then-current form of standard Franchise Agreement. Franchisor has the right to charge Franchisee a renewal fee of One Thousand Dollars ($1,000) which is payable at the time of renewal. **The Franchisee may choose to retain the provisions of this agreement with respect to the amount of royalty fee should the then-current agreement call for a larger royalty.**

. . . .

        **C.    RENEWAL AGREEMENTS/RELEASES**

    To renew the Franchise, Franchisor, Franchisee (and the owners, partners, or members of Franchisee, if Franchisee is a corporation, partnership or limited liability company) **must execute the form of and be bound by the Franchise Agreement and ancillary agreements [Home Instead] customarily uses in the grant of franchises for the**

> **ownership and operation of Businesses (with appropriate
> modifications to reflect the fact that the agreement relates
> to the grant of a renewal franchise)** and Franchisee and its
> owners, partners or members must execute general releases, in
> form and substance satisfactory to [Home Instead], of all claims
> against [Home Instead] and its affiliates, officers, directors,
> employees and agents. Failure by Franchisee and its owners,
> partners or members to sign agreement(s) and releases within
> thirty (30) days after delivery to Franchisee is deemed an election
> by Franchisee not to renew the Franchise.

Filing 20-14 at 29–30; filing 20-15 at 29–30 (emphasis supplied).

In short, the franchisee has a right to renew, but not necessarily on the
same terms. Instead, the renewal will be on the terms used by Home Instead
at the time of the renewal, with one important exception: the franchisee is
granted the right to continue paying the same amount of royalty fees.

The other key provision requires franchisees to maintain specified
levels of minimum gross sales each month. The provision is set forth in § 2.F
of both Renewal Agreements:

> **The exclusive right to operate the Franchised Business
> within the Exclusive Area is contingent upon Franchisee
> achieving and maintaining minimum Gross Sales** of Five
> Thousand Dollars ($5,000) in each twice-monthly billing period
> (Ten Thousand Dollars ($10,000) per month) by the end of the
> first year of operation of the Franchised Business, achieving and
> maintaining minimum Gross Sales of Ten Thousand Dollars
> ($10,000) in each twice-monthly billing period (Twenty Thousand
> Dollars ($20,000) per month) by the end of the third year of
> operation of the Franchised Business, and achieving and
> maintaining minimum Gross Sales of Fifteen Thousand Dollars
> ($15,000) in each twice-monthly billing period (Thirty Thousand
> Dollars ($30,000) per month) from the end of the fifth year of
> operation of the Franchised Business **through the end of the
> term of this Agreement or any renewal term of a renewal
> Franchise Agreement (the "Performance Standard")**.
> Failure to achieve and maintain the minimum Gross Sales may
> result in the forfeiture of the right of exclusivity granted
> Franchisee to the Exclusive Area. In addition, failure to achieve
> the minimum Gross Sales will constitute a default of this
> Agreement and Franchise has the right to terminate this
> Agreement and/or to grant additional franchises within the

Exclusive Area to third parties. Upon termination of this Agreement, all rights granted to Franchisee end.

Filing 20-14 at 6; filing 20-15 at 6 (emphasis supplied).

When it came time to renew the franchise agreements again in 2012, a disagreement arose over the meaning of § 2.F and the applicable Performance Standard. In September 2011, Home Instead mailed a letter to the Florances, reminding them that their franchises would expire in August 2012 and providing information on how to renew. Filing 20-1 at ¶ 43; filing 20-17 at 1. The letter also notified them of an important change to the standards governing new and renewal franchises as of 2011: the monthly performance standard had increased from $30,000 to $70,000. Filing 20-17 at 1.

On June 15, 2012, Home Instead mailed the Florances the then-current "Franchise Disclosure Document" (FDD)[1] and two copies of renewal agreements containing the standard 2012 terms. Filing 20-18. Under the 2002 Renewal Agreements, the Florances were required to execute the new renewal agreements and return them to Home Instead by July 18, 2012. Filing 20-14 at 30; filing 20-15 at 30. Otherwise, they would be deemed to have elected not to renew. Filing 20-14 at 30; filing 20-15 at 30. At the Florances' request, Home Instead granted an extension until July 31. Filing 20-20 at ¶ 5.

The 2012 standard agreements required franchisees to maintain minimum gross sales of $70,000 a month by the end of their seventh year of operation. Filing 20-18 at 1; filings 10-6 at 10; 10-8 at 10. As of July 2012, the Florances' franchises were not performing at that level. Filing 20-18 at 1; filing 20-1 at ¶ 44. The parties had discussed the matter for nearly a year, and Home Instead ultimately offered to renew the agreements despite this deficiency. Filing 20-24; filing 20-1 at ¶ 44. In exchange, however, Home Instead insisted the franchises meet the new performance standard by 2013 and required the Florances to agree to certain additional conditions. Filing 20-24; filing 20-1 at ¶ 44. These terms were unacceptable to the Florances, and further negotiations failed to result in an agreement. Filing 20-23; filing 20-25 through 20-29. In the end, the expiration deadline of August 3, 2012 came and went without any agreement to renew the franchises.

On July 30, 2012, the Florances notified Home Instead that they disputed Home Instead's interpretation of § 2.F in the 2002 Renewal Agreements and advised that they would continue to operate their franchises as if the Renewal Agreements were still in effect. Filing 10 at ¶ 15; filing 10-

---

[1] The Federal Trade Commission requires franchisors to provide prospective franchisees with "franchise disclosure documents" setting forth, among other things, the requirements applicable to franchisees. *See* 16 C.F.R. Part 436.

10. The Florances continued running their franchises and continued sending royalty payments to Home Instead. Filing 10 at ¶ 15; filing 20-20 at ¶ 8. Home Instead refused to accept these payments. Filing 20-20 at ¶ 8.

On August 31, 2012, Home Instead essentially pulled the plug on the Florances. Filing 10 at ¶ 18. Home Instead disabled the Florances' access to its e-mail servers and web portal, and shut down Friend of a Friend's website. Filing 10 at ¶¶ 18a–18c, 18e. The Florances depend on these resources to run their franchises. Filing 10 at ¶¶ 18a–18c. Home Instead also began referring clients in the Florances' exclusive territory to other franchises. Filing 10 at ¶¶ 18d, 18f. And Home Instead has forbidden them from attending an upcoming franchisee conference or from holding their business out as a current franchise. Filing 10 at ¶¶ 18g–18h.

The Florances argue that Home Instead has wrongfully refused to renew their franchises, and that its acts are making it nearly impossible to run their business, resulting in lost income, customers, and good will among clients and potential clients. They ask this Court to enter a preliminary injunction restoring the "operational status quo" of the 2002 Renewal Agreements. Filing 15 at 13–14.

## II. ANALYSIS

When deciding whether to issue a preliminary injunction, the Court turns to the four *Dataphase* factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Roudachevski v. All-American Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).[2] A preliminary injunction is an extraordinary remedy, and the movant bears the burden of establishing its propriety. *Roudachevski*, 648 F.3d at 705. The Florances have not met this burden.[3]

---

[2] The Renewal Agreements each state that Nebraska law shall apply, and neither party has suggested otherwise. *Cf. Vanice v. Oehm*, 526 N.W.2d 648, 651 (Neb. 1995) (choice-of-law clauses generally upheld). However, federal, rather than state law governs the Court's analysis of whether a preliminary injunction should issue. *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1448 (11th Cir. 1991). The remaining substantive issues in this case (with the obvious exception of Home Instead's claims under the Lanham Act) are governed by Nebraska law.

[3] Some courts apply a "heightened standard" to injunctions that would disrupt the status quo between the parties, such that the *Dataphase* factors must "'weigh heavily and compellingly'" in the movant's favor. *See, e.g., Salt Lake Tribune Pub.*

Specifically, they have failed to show any likelihood of success on the merits. In most cases the Court should assess the relative strengths of all four of the *Dataphase* factors and then consider their collective balance. *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011). But in this case, the Florances' entitlement to an injunction rests solely on an issue of contract interpretation. They concede that there is no ambiguity in the provisions at issue. Filing 15 at 8, 10. Because there is no ambiguity, the meaning of the contract presents a question of law. *Ruble v. Reich*, 611 N.W.2d 844, 850 (Neb. 2000). The Court finds, as set forth below, that the Renewal Agreements do not support the Florances' argument.

**Movant's Probability of Success on the Merits**

Success on the merits has been referred to as the most important of the *Dataphase* factors. *Roudachevski*, 648 F.3d at 706; *Brady*, 640 F.3d at 789. The movant need not show that it will ultimately win, or even that the movant is more likely than not to prevail. *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991). The Florances have not met this standard in any respect: the probability they will succeed on the merits is nil. So, even if the Court assumes that the remaining *Dataphase* factors weigh in the Florances' favor, they are not entitled to a preliminary injunction.

The Florances' claim for injunctive relief rests solely upon a strained reading of one sentence of § 2.F of the 2002 Renewal Agreements. Under that section, the franchisee must maintain minimum gross sales of $30,000 per month after the end of the fifth year "of operation of the Franchised Business through the end of the term of this Agreement **or any renewal term of a renewal Franchise Agreement** (the "Performance Standard")." Filing 20-14 at 6; filing 20-15 at 6 (emphasis supplied). The Florances argue that the highlighted language means that the Performance Standard will remain $30,000 per month for as long as their franchises are renewed. They paraphrase § 2.F as follows: "the applicable Performance Standard 'through the end of the term of this Agreement *or any renewal term of a renewal Franchise Agreement*' shall be gross sales of $30,000 per month." Filing 15 at 10. This reading places a permanent ceiling on the Performance Standard. The Florances' reading, however, has conveniently omitted the word "minimum."

---

*Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1099 (10th Cir. 2003). Home Instead argues that the present injunction would upset the status quo by reinstating a franchise agreement that has already, by its own terms, expired. The Court need not address this matter further: even under the "ordinary" standard, the Florances are not entitled to injunctive relief.

The Court may not omit words from the contract. Instead, the Court must give the contract a reasonable construction, which requires construing the contract as a whole and, if possible, giving effect to every part of the contract. *Hearst-Argyle Props., Inc. v. Entrex Commc'n Servs., Inc.*, 778 N.W.2d 465, 470 (Neb. 2010). And where the terms of a contract are clear, they are to be accorded their plain and ordinary meaning. *Poulton v. State Farm Fire and Cas. Cos.*, 675 N.W.2d 665, 671 (Neb. 2004).

When read naturally and together with the rest of the Renewal Agreements, § 2.F creates a floor, not a ceiling. For the duration of the Renewal Agreements, and for any subsequent renewal, franchisees must achieve a <u>minimum</u> of $30,000 in monthly gross sales. Nothing in § 2.F prohibits the franchisor from raising the minimum amount. A minimum of $70,000 includes, and is not inconsistent with, a minimum of $30,000. And the provisions governing renewals, §§ 15.A and 15.C, state that, in order to renew, franchisees must agree to the then-current standards. Filing 20-14 at 29–30; filing 20-15 at 29–30 (emphasis supplied). Under the 2002 Renewal Agreements, the continued right to a franchise was conditioned on, among other requirements, $30,000 per month in gross sales. The 2012 standard agreements contain an extra condition: an additional $40,000 in gross monthly sales. Sections 15.A and 15.C give Home Instead the right to insist on new terms and conditions each time a franchise is up for renewal, and that is precisely what Home Instead did.

There is nothing wrong or suspect about this arrangement—in fact, the renewal provisions protect franchisees as well as Home Instead. True, franchisees' right to renew is limited: they are not allowed to retain the same standards (except as to the amount of royalty fees). But if franchisees have met their business standards, they have an absolute right to renew, provided they agree to live up to the standards applicable to all new franchisees for the upcoming renewal period. The upshot is that Home Instead cannot refuse to renew a performing franchise, nor can it single out a franchise up for renewal and offer terms it knows the franchisee cannot meet.

Home Instead may, however, continue to update the standard requirements for new franchises, and insist that renewing franchises conform. This serves two important functions. First, it allows Home Instead to maintain relatively uniform franchise agreements. *Cf. Re/Max North Cent., Inc. v. Cook*, 272 F.3d 424, 431–32 (7th Cir. 2001) (franchisors have legitimate interest in maintaining uniform contract terms and re-writing their standard contracts to adapt to new conditions). Second, it prevents Home Instead from being stuck with terms that have ceased being profitable or are failing to account for current market conditions.

The Florances also argue that the language "or any renewal term of a renewal Franchise Agreement" in § 2.F is rendered superfluous if Home Instead can always raise the minimum Performance Standard. But the clause does serve a purpose: it sets a minimum that renewal agreements must meet. And it makes clear that once a franchise is renewed, it must continue to meet the $30,000 monthly minimum, rather than reverting to the first year's $10,000 a month minimum, or the then-current equivalent. The agreement does not envision franchisees' sales fluctuating up and down every 10 years; it provides for a steady increase for the first 5 years, then maintaining at least $30,000 in sales a month thereafter. This clause protects Home Instead, not franchisees—but that does not make it superfluous.

The parties have also shown that they knew how to let franchisees retain certain terms, even upon renewal. Section 15.A provides that franchisees may continue paying the same amount of royalty fees, even after a renewal. Filing 20-14 at 29; filing 20-15 at 29. There is no equivalent right to retain the same monthly Performance Standard.

The Florances' argument is contradicted by the plain language of the Renewal Agreements. They concede that the relevant provision, § 2.F, is not ambiguous. The Court agrees; but the Court finds that the provisions of § 2.F contravene the Florances' argument. And however § 2.F might be construed standing alone, it must be read together with the provisions governing renewals. *Hearst-Argyle Props., Inc.*, 778 N.W.2d at 470.

## III. CONCLUSION

The Court finds that the Florances are not entitled to a preliminary injunction. The Court has interpreted the four corners of the franchise agreements, as a matter of law. Because of the nature and posture of the proceedings, the Florances cannot demonstrate any probability that they will succeed on the merits. This is the 800-pound gorilla in the room, and it is not going to budge, even if the remaining *Dataphase* factors all joined in pushing.

Accordingly,

IT IS ORDERED:

1.    The Florances' motion for preliminary injunction (filing 9) is denied.

Dated this 20th day of September, 2012.

BY THE COURT:

_____

John M. Gerrard
United States District Judge